1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IRMA FERNANDEZ and PATRICIA FERNANDEZ,<br><br>                                    Plaintiffs,<br><br>v.<br><br>DEBT ASSISTANCE NETWORK, LLC,<br><br>                                    Defendant. | Case No.  19-cv-1442-MMA (JLB)<br><br>**ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION OR, ALTERNATIVELY, TO DISMISS FOR IMPROPER VENUE**<br><br>[Doc. No. 17] |

        On August 1, 2019, Irma Fernandez and Patricia Fernandez (collectively, "Plaintiffs") filed a Complaint against Debt Assistance Network, LLC ("Defendant"). Doc. No. 1 ("Compl.").[1]  Plaintiffs allege seven causes of action: (1) violation of the Credit Repair Organization Act ("CROA"); (2) violation of the California Credit Services Act ("CCSA"); (3) violation of the California Consumers Legal Remedies Act ("CLRA"); (4) violation of the California Unfair Competition Law ("UCL"); (5) breach of contract; (6) negligence; (7) negligent misrepresentation; and (8) intentional

---

[1]  All citations refer to the pagination assigned by the CM/ECF system.

misrepresentation. *Id.* Defendant answered Plaintiffs' allegations on November 13, 2019. Doc. No. 10.

On December 12, 2019, Defendant filed a motion to compel arbitration or, alternatively, to dismiss for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3). Doc. No. 17. Relatedly, Defendant also seeks leave to file a motion for an award of attorneys' fees, arguing that Plaintiffs have no good faith objection to arbitration. *Id.* at 20–22. Plaintiffs filed an opposition to Defendant's motion, and Defendant replied. *See* Doc. Nos. 22, 23. The Court found the matter suitable for determination on the papers and without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7.1.d.1. Doc. No. 24.

For the reasons set forth below, the Court **DENIES** Defendant's motion to compel arbitration and **DENIES** Defendant's request for attorneys' fees.

## I. BACKGROUND[2]

Plaintiffs purchased credit repair services from Defendant. Compl. ¶ 1. Defendant "represents that it provides debt relief, debt negotiation, and debt management services to Plaintiffs . . . to eliminate or reduce their debts." *Id.* ¶ 2. Plaintiffs allege "Defendant operates an elaborate scheme to defraud debtors that preys on consumers who are drowning in credit card and unsecured debt." *Id.* ¶ 6.

Before November 2016, Plaintiffs incurred debt to several creditors. *Id.* ¶ 21. On November 18, 2016, Plaintiffs signed "a contract with Defendant entitled 'Consumer Tender Of Offer and Debt Assumption Agreement' ['Debt Agreement'] to receive Defendant's assistance with debt settlement and to improve Plaintiffs' consumer credit record, history, or rating with credit reporting agencies." *Id.* ¶ 23; *see also* Doc. No. 17-1 6–9. On the same day, Plaintiffs also signed an Automatic Clearing House Agreement

---

[2] These facts are taken from the Complaint as well as related declarations and exhibits.

("ACH Agreement") with Secure Account Service ("SAS") titled "Account Agreement and Disclosure Statement." Doc. No. 17-1 at 11–12.

A declaration signed by a principal member of Defendant provides that Defendant's "acceptance of Plaintiffs' offer was conditioned on Plaintiffs agreeing to execute both the [Debt Agreement] and the ACH Agreement." *Id.* at 3. Further, without the ACH Agreement, Defendant claims that it "would not have received any payments from Plaintiffs." *Id.* The ACH's "Scope of Services and Limitation of Liability" section states that "SAS is a third-party processor." *Id.* The section continues: "[SAS] is not a party to the agreement between Client and [the Referring Company] and SAS does not participate in the underlying debt negotiations." *Id.*

The Debt Agreement states "[a]ll sums paid according to the terms shown on the ACH AGREEMENT, which is included as part of this AGREEMENT." *Id.* at 8. The ACH Agreement contains the following arbitration clause:

> **6.** **BINDING ARBITRATION, GOVERNING LAW, AND ATTORNEY'S FEES**. Client agrees that any dispute or claim arising out of this Agreement or otherwise, related to SAS's services to Client, shall be resolved through binding arbitration with the American Arbitration Association in Phoenix, Arizona and the decision of the arbitrator shall be final and enforceable by a court of competent jurisdiction. Client further agrees that this Agreement, and any claims it may bring against SAS, shall be construed according to the laws of the State of Arizona. Further, Client agrees that the successful party to any action between SAS and Client shall be entitled to the recovery of its reasonable attorneys' fees and costs.

*Id.* at 11.

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA") permits "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States district court . . . for an order directing that . . . arbitration proceed in the manner provided for in [the arbitration] agreement." 9 U.S.C. § 4. Upon a

showing that a party has failed to comply with a valid arbitration agreement, the district court must issue an order compelling arbitration. *Id.* The Supreme Court has stated that the FAA espouses a general policy favoring arbitration agreements. *AT&T Mobility v. Concepcion*, 563 U.S. 333, 339 (2011). Federal courts are required to rigorously enforce an agreement to arbitrate. *See id.*

In determining whether to compel a party to arbitration, the Court may not review the merits of the dispute; rather, the Court's role under the FAA is limited to determining "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Kilgore v. KeyBank, Nat. Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)); *see also* 9 U.S.C. § 4. If the Court finds that the answers to both questions are "yes," then the Court must compel arbitration. *Chiron Corp.*, Inc., 207 F.3d at 1130. A court's circumscribed role in making these inquiries "leav[es] the merits of the claim and any defenses to the arbitrator." *Id.* (quoting *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 478 (9th Cir. 1991).

As to the first inquiry—whether the parties agreed to arbitrate—courts adopt a standard similar to summary judgment. *See Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991); *Lopez v. Terra's Kitchen, LLC*, 331 F. Supp. 3d 1092, 1097 (S.D. Cal. 2018); *Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 988 (N.D. Cal. 2017). Agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Courts must apply ordinary state law principles in determining whether to invalidate an agreement to arbitrate. *Ferguson v. Countrywide Credit Indus., Inc.*, 298 F.3d 778, 782 (9th Cir. 2002). As such, arbitration agreements may be "invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" *Concepcion*, 563 U.S. at 339–41 (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). In assessing whether there is an agreement to arbitrate, the presumption and policy in favor of arbitration does not apply, and instead,

4

the issue is determined through standard contract law principles. *See Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006); *see also E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 293 (2002).

As to the second inquiry—whether the agreement encompasses the dispute at issue—courts resolve any "ambiguities as to the scope of the arbitration clause itself . . . in favor of arbitration." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 475–76 (1989); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."). Moreover, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000). Absent contractual ambiguity, "it is the language of the contract that defines the scope of disputes subject to arbitration." *Waffle House, Inc.*, 534 U.S. at 289.

### III. DISCUSSION

**A. Evidentiary Objections**

As a preliminary matter, Defendant objects to the Declaration of Irma Fernandez (Doc. No. 22-2) and Declaration of Patricia Fernandez (Doc. No. 22-1) provided in support of Plaintiffs' opposition brief. Doc. No. 23-1; Doc. No. 23-2. Both declarations contain almost identical content. *Compare* Doc. No. 22-1, *with* Doc. No. 22-2. Defendant argues that the content is "irrelevant, argumentative, speculative and self-serving, lacks foundation, and constitutes improper legal opinion." Doc. No. 23-1 at 4–6; Doc. No. 23-2 at 4–6.

As noted above, in addressing whether there is a valid arbitration agreement, the Court adopts a standard akin to summary judgment. *See Three Valleys Mun. Water Dist.*, 925 F.2d at 114; *Lopez*, 331 F. Supp. 3d at 1097. "A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of Am.,*

*NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002); *see also* Fed. R. Civ. P. 56(c).  However, courts will consider evidence with *content* that would be admissible at trial even if the *form* of the evidence would be inadmissible.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) (admitting a diary in considering summary judgment where its contents were within the author's personal knowledge and could be admitted in several ways at trial despite a hearsay objection).  "That an affidavit is self-serving bears on its credibility, not on its cognizability for purposes of establishing a genuine issue of material fact." *United States v. Shumway*, 199 F.3d 1093, 1104 (9th Cir. 1999).  "Only in certain instances—such as when a declaration 'state[s] only conclusions, and not "such facts as would be admissible in evidence,"'—can a court disregard a self[-]serving declaration for purposes of summary judgment." *S.E.C. v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007) (quoting *Shumway*, 199 F.3d at 1104).  Moreover, "'objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself' and unnecessary to consider here." *Holt v. Noble House Hotels & Resort, Ltd*, 370 F. Supp. 3d 1158, 1164 (S.D. Cal. 2019) (quoting *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006)).

    The declarations set forth Plaintiffs' present individual understanding of the contracts as it relates back to the execution of the contracts.  They are clearly self-serving to persuade the Court to find no valid arbitration agreement exists between Plaintiffs and Defendant.  However, self-serving statements go to credibility—not admissibility. *See Shumway*, 199 F.3d at 1104.  And Defendant's arguments based on relevance, speculation, argument, and legal opinion are unnecessary to consider here because they are "duplicative of the summary judgment standard itself." *Holt*, 370 F. Supp. 3d at 1164 (quoting *Burch*, 433 F. Supp. 2d at 1119).  Additionally, the Court finds "it is unnecessary to expressly rule on many of the objections because they would not alter the Court's resolution" of the present motion. *White v. Home Depot U.S.A. Inc.*, No. 17-CV-

00752-BAS-AGS, 2019 WL 1171163, at *1 (S.D. Cal. Mar. 13, 2019).  Accordingly, the Court **OVERRULES** Defendant's evidentiary objections.

**B. Choice of Law**

Plaintiffs assert that enforcing the Arizona forum selection clause and choice of law clause "violate California public policy, jeopardize due process, and deprive Plaintiffs access to justice in the appropriate forum."  Doc. No. 22 at 24.  Plaintiffs elaborate that an Arizona forum would deprive Plaintiffs of rights provided under California law, would have no relation to Defendant, and would have no nexus between Defendant's conduct and Plaintiffs' claims.  *Id.*  Defendant replies that the Arizona forum selection clause and choice of law clause do not violate California public policy.  Doc. No. 23 at 10.  Defendant asserts that Plaintiffs "have made no showing that (1) applying Arizona's law 'is contrary to a fundamental policy of California,' or that (2) 'California has a materially greater interest than [Arizona] in resolution of the issue.'"  *Id.* at 10 (quoting *Ruiz v. Affinity Logistics Corp.*, 667 F.3d 1318, 1323 (9th Cir. 2012)).  Defendant further argues that Plaintiffs have failed to show that Arizona law directly conflicts with California law.  *Id.*  Arguing that Plaintiffs merely assert "that venue *would have been* appropriate in California," Defendant emphasizes that "Plaintiffs have failed to show that there is anything unfair or unreasonable about the mandatory choice of forum clause."  *Id.* at 11.

"Before a federal court may apply state-law principles to determine the validity of an arbitration agreement, it must determine which state's laws to apply.  It makes this determination using the choice-of-law rules of the forum state . . . ."  *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 994 (9th Cir. 2010) (citing *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996)).

Here, the Court notes that despite Defendant advocating for the validity of the Arizona forum selection and choice of law clauses, it relies upon California law in arguing the merits of its motion.  Regardless, the Court must apply California's choice of

law rules to determine whether to apply California or Arizona law. *See Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1002 (9th Cir. 2010).

"When an agreement contains a choice of law provision, California courts apply the parties' choice of law unless the analytical approach articulated in § 187(2) of the Restatement (Second) of Conflict of Laws . . . dictates a different result." *Id.* (quoting *Hoffman v. Citibank (S.D.), N.A.*, 546 F.3d 1078, 1082 (9th Cir. 2008) (per curiam)). Under the Restatement approach, the court must first determine

> (1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law. If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law. If, however, either test is met, the court must next determine whether the chosen state's law is contrary to a *fundamental* policy of California. If there is no such conflict, the court shall enforce the parties' choice of law. If, however, there is a fundamental conflict with California law, the court must then determine whether California has a "materially greater interest than the chosen state in the determination of the particular issue . . . ." If California has a materially greater interest than the chosen state, the choice of law shall not be enforced, for the obvious reason that in such circumstance we will decline to enforce a law contrary to this state's fundamental policy.

*Nedlloyd Lines B.V. v. Superior Court*, 834 P.2d 1148, 1152 (Cal. 1992) (footnotes omitted) (quoting Restatement (Second) of Conflict of Laws § 187(2) (Am. Law Inst. 1971)).

Here, the ACH Agreement contains a choice of law provision: "Client further agrees that this Agreement, and any claims it may bring against SAS, shall be construed according to the laws of the State of Arizona." Doc. No. 17-1 at 11. Given the choice of law provision, the Court applies Arizona law regarding claims brought under the ACH Agreement unless the Restatement approach requires a different result. *See Bridge Fund Capital Corp.*, 622 F.3d at 1002 (quoting *Nedlloyd Lines B.V.*, 834 P.2d at 1152).

Under the Restatement approach, Arizona has a substantial relationship to the transaction because SAS, a signatory of the ACH Agreement, is based in Arizona. Thus, given that one of the preliminary tests is met, the Court must now determine whether Arizona law is "is contrary to a *fundamental* policy of California." *Nedlloyd Lines B.V.*, 834 P.2d at 1152. Plaintiffs fail to adequately cite to an established, concrete policy that conflicts with Arizona law. Relatedly, Plaintiffs further fail to cite relevant Arizona law to contrast against California law even if it had cited to a fundamental California policy. Similarly, the Court finds Plaintiffs' argument that "California has the greater material interest in protecting the rights of its citizens," Doc. No. 22 at 24, is vague and conclusory, and it thus fails to persuade the Court that California law should apply instead of Arizona law. Because Plaintiffs fail to demonstrate a conflict between California and Arizona law, the Court must enforce the Arizona choice of law provision under the Restatement approach.

Because the Court finds that the choice of law provision and the Restatement approach reach the same result, the Court would apply Arizona law. *However*, because the arbitration clause falls outside the scope of the dispute at issue, *see infra* Section III.D, the Court does not apply the Arizona choice of law provision or the forum selection clause. Without an applicable choice of law provision, the Court applies California contract law to determine whether a valid arbitration agreement exists. *See Republic Pictures Corp. v. Rogers*, 213 F.2d 662, 664 (9th Cir. 1954) ("Being a diversity of citizenship case, the contracts will be interpreted so as to reach the same results as would be reached in a California court.").

## C. Whether a Valid Arbitration Agreement Exists

Defendant argues that the parties entered into a valid arbitration agreement. Doc. No. 17 at 15–16. Defendant points to the Debt Agreement signed by Plaintiffs and argues that the Debt Agreement incorporates the ACH Agreement, which Plaintiffs executed the same day as the Debt Agreement. Doc. No. 17 at 15; Doc. No. 17-1 at 9, 12. Defendant further argues that it is a third-party beneficiary of the ACH Agreement

and thus can enforce the ACH Agreement. Plaintiffs respond that no valid agreement exists between the parties. Doc. No. 22 at 11. Specifically, Plaintiffs argue that there was no mutual assent between Plaintiffs and Defendant, incorporation of the AHC Agreement into the Debt Agreement does not allow Defendant to "step into the shoes of SAS" to enforce the arbitration clause, Defendant is not a third-party beneficiary of the ACH Agreement, and the arbitration clause is unenforceable because it is unconscionable and violates California public policy. Doc. No. 22 at 22, 19, 23.

### 1. Whether the ACH Agreement is Incorporated into the Debt Agreement

Under contract incorporation, "[a] secondary document becomes part of a contract as though recited verbatim when it is incorporated into the contract by reference provided that the terms of the incorporated document are readily available to the other party." *King v. Larsen Realty, Inc.*, 121 Cal. App. 3d 349, 357 (1981); *see also Incorporation by Reference*, Black's Law Dictionary (11th ed. 2019). Incorporation of a secondary document into a contract by reference requires that "[1] the reference must be clear and unequivocal, [2] the reference must be called to the attention of the other party and he must consent thereto, and [3] the terms of the incorporated document must be known or easily available to the contracting parties." *Wolschlager v. Fid. Nat'l Title Ins. Co.*, 4 Cal. Rptr. 3d 179, 184 (Ct. App. 2003) (quoting *Shaw v. Regents of Univ. of California*, 58 Cal. App. 4th 44, 54 (1997)). Incorporation by reference applies in the arbitration context. *E.g.*, *Valley Casework, Inc. v. Comfort Constr., Inc.*, 76 Cal. App. 4th 1013, 1022 (1999) ("Where a construction contract or subcontract incorporates the arbitration procedures found in the related contract, arbitration may be ordered.").

Here, the Court finds that the Debt Agreement incorporated the ACH Agreement. First, the Debt Agreement clearly and unequivocally refers to the ACH Agreement in stating "[a]ll sums paid according to the terms shown on the ACH AGREEMENT, which is included as part of this AGREEMENT." Doc. No. 17-1 at 8. Second, the incorporation clause is called to the attention of the party because not only does the clause include all-capitalized words and underlining but also the incorporation was done

19-cv-1442-MMA (JLB)

as part of the signed and executed Debt Agreement.  *See id.* at 8–9; *see also King*, 121 Cal. App. 3d at 358 ("As a general rule, a party is bound by the provisions of an agreement which he signs, even though he does not read them and signs unaware of their existence.").  Third, the terms of the incorporated ACH Agreement were known and available to the contracting parties given that Plaintiffs signed and executed the ACH Agreement the same day as the Debt Agreement.  *See* Doc. No. 17-1 at 9, 12.

Therefore, the Court finds that the Debt Agreement incorporates the terms of the ACH Agreement.  The Court must now assess (1) whether the terms of the arbitration clause apply to the contractual relationship between Plaintiffs and Defendant or only between Plaintiffs and SAS or, if the latter scenario be the case, (2) whether Defendant can enforce the arbitration clause as a third-party beneficiary.

**2. Whether the Arbitration Clause Applies to the Contractual Relationship Between Plaintiffs and Defendant**

The first step to determine whether to compel arbitration is not merely to uncover whether there is a *contract* between the parties but, rather, "whether a valid *agreement to arbitrate* exists."  *Kilgore*, 718 F.3d at 1058 (emphasis added) (quoting *Chiron Corp.*, 207 F.3d at 1130).  Therefore, the Court must now determine whether the terms of the ACH Agreement's arbitration clause cover the Plaintiffs-Defendant relationship and Plaintiffs-SAS relationship *or* only the Plaintiffs-SAS relationship.

Defendant argues that because the Debt Agreement's incorporation clause "unequivocally places zero restriction on the parts of the ACH Agreement that are incorporated in the Debt Assumption Agreement, the Court must find that the Debt Assumption Agreement incorporated the entire document, Arbitration Agreement and all."  Doc. No. 17 at 15.  Defendant appears to argue that the clause is not limited to the Plaintiffs-SAS relationship and, instead, extends broader to be include the Plaintiffs-Defendant relationship through the Debt Agreement's incorporation provision.  *See id.* at 16 ("The Arbitration Agreement covers 'any dispute' arising out of the ACH Agreement 'or otherwise' that is 'related' to the services described in the ACH Agreement.").  It

19-cv-1442-MMA (JLB)

argues that this broadness makes the arbitration clause applicable to the Plaintiffs-Defendant relationship because the ACH Agreement was "designed to facilitate the exchange of consideration between the Plaintiffs and [Defendant]." *Id.* Plaintiffs counter that

> even if Defendant were to successfully incorporate the SAS ACH Agreement into its own separate contract, the arbitration provision in the SAS ACH Agreement is unambiguous in its narrowly tailored terms which clearly and repetitively state that the arbitration provision concerns disputes or claims "related to SAS's services to [Plaintiffs]" and their claims against SAS.

Doc. No. 22 at 19.

In another case involving the same Defendant and a similar—if not identical—agreement to the one before this Court, the court ordered arbitration after finding that the debt agreement between defendant and plaintiff incorporated the "entire" SAS agreement between SAS and plaintiff, including the arbitration clause. *Hunt v. Debt Assistance Network, LLC*, No. 1:18CV644, 2019 WL 4647008, at *4 (M.D.N.C. Sept. 24, 2019) (applying North Carolina contract law). However, the court there failed to address whether the arbitration clause covered the specific relationship between defendant and plaintiff. *See id.* at 4–5. Instead, the court proceeded to determine whether the arbitration clause covered the dispute at issue after finding that incorporation satisfied the first inquiry of whether there was an agreement to arbitrate. *See id.*

Here, the Court finds that the plain language of the arbitration clause governs the relationship between SAS and Plaintiff, defined as "Client" in the ACH Agreement. The Court further finds that the arbitration clause does not govern the Plaintiffs-Defendant relationship. The arbitration clause begins by stating the following: "Client agrees that any dispute or claim arising out of *this Agreement* or otherwise, *related to SAS's services* to Client, shall be resolved through binding arbitration . . . ." Doc. No. 17-1 at 11 (emphasis added). The Court finds that "this Agreement" refers to the ACH Agreement

and does not refer to the Debt Agreement despite incorporation. Even though the Debt Agreement incorporates the terms of the ACH Agreement, the terms within the arbitration clause do not govern the Plaintiffs-Defendant relationship because the terms themselves are narrow and apply to payment processing by SAS. This finding is underscored by the language "otherwise, related to SAS's services." *Id.* Given the construction of the clause, "SAS's services" appears to be the broadening language of the clause. However, it is telling that the broadness is explicitly confined to the relationship with SAS. The remainder of the contract section further supports this limited interpretation of the arbitration clause given the similar language used in the choice of law and attorneys' fees clauses. *See id.*

The Court finds Defendant's argument to the contrary unavailing. Defendant argues Plaintiffs' contention that the arbitration clause only covers claims against SAS "contradicts the broad, unambiguous language that demonstrates the expansive scope of the Arbitration Agreement." Doc. No. 23 at 4; *see also* Doc. No. 17 at 17. Defendant emphasizes that "Plaintiffs' claims relate . . . to payments made to [Defendant]— *payments that could not have been made possible without the ACH Agreement*." Doc. No. 17 at 17; Doc. No. 23 at 4. The Court agrees with Defendant that the language of the arbitration clause sweeps broadly. However, its scope is ultimately limited to Plaintiffs' relationship with SAS, where SAS operated as a "third-party processor" that facilitated Plaintiffs' relationship with Defendant. Doc. No. 17-1 at 11.

Therefore, the Court finds that there is no valid arbitration agreement between Plaintiffs and Defendant—unless the Court finds Defendant can enforce the agreement as a third-party beneficiary. *See infra* Section III.C.3.

### 3. Whether Defendant Can Enforce the Arbitration Clause as a Third-Party Beneficiary

Alternatively, the Court may find that the arbitration clause's terms can be enforced by Defendant if the Defendant is a third-party beneficiary of the ACH Agreement. Plaintiffs argue that "Defendant has not and cannot make any showing that

the arbitration provision in [SAS's] contract was intended to confer any benefit upon Defendant." Doc. No. 22 at 18. Defendant responds in its reply that the ACH Agreement was designed to facilitate the Debt Agreement and that a third-party beneficiary is not required to be expressly mentioned in the contract. Doc. No. 23 at 5–6.

Third-party beneficiaries can enforce an arbitration provision. *Cohen v. TNP 2008 Participating Notes Program, LLC*, 243 Cal. Rptr. 3d 340, 355 (Ct. App. 2019) (citing *Smith v. Microskills San Diego L.P.*, 63 Cal. Rptr. 3d 608, 613 (Ct. App. 2007)). "To sue as a third-party beneficiary of a contract, the third party must show that the contract reflects the express or implied intention of the parties to the contract to benefit the third party." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1211 (9th Cir. 1999), *opinion amended on denial of rehg*, 203 F.3d 1175 (9th Cir. 2000). "[T]hird party beneficiary principles do not require that the person to be benefited be named in the contract, but rather allow the third party to qualify as a contract beneficiary if 'the contracting parties must have intended to benefit that individual and such intent appears on the terms of the agreement.'" *San Diego Hous. Comm'n v. Indus. Indem. Co.*, 95 Cal. App. 4th 669, 685 (2002) (quoting *Harper v. Wausau Ins. Co.*, 56 Cal. App. 4th 1079, 1086 (1997)).

The ACH Agreement facilitates the underlying Debt Agreement where SAS operates as a "third-party processor" and provides "payment processing services" "pursuant to [Plaintiffs'] underlying agreement with the referring company." Doc No. 17-1 at 11. The ACH Agreement states that "[SAS] is not a party to the agreement between Client and [the Referring Company] and SAS does not participate in the underlying debt negotiations." *Id.* The Court finds that the ACH Agreement arises out of, and indeed, bolsters the operation of the underlying Debt Agreement between Plaintiffs and Defendant, who appears to be defined as the "referring company." But for the ACH Agreement, Plaintiffs would have been unable to fulfil its contractual obligations under the Debt Agreement.

Therefore, the Court finds that Defendant is a third-party beneficiary of the ACH Agreement even if the arbitration clause only pertains to actions between Plaintiffs and SAS. Thus, Defendant can enforce the terms of the ACH Agreement's arbitration clause against Plaintiffs, but only with respect to *disputes that involve the payment processing services as detailed in the ACH Agreement*.

### 4. Whether the Arbitration Clause is Unconscionable

Plaintiffs argue in their opposition brief that the ACH Agreement is unconscionable. Doc. No. 22 at 19–23. Specifically, Plaintiffs assert that the ACH Agreement is an adhesion contract because of its take-it-or-leave-it nature that deprived Plaintiffs of their negotiating power. *Id.* at 20. Plaintiffs argue that the ACH Agreement is procedurally unconscionable because it was "drafted entirely by SAS and did not alert Plaintiffs or give them reason to know or expect that any claims that Plaintiffs sought to pursue against Defendant regarding Defendant's conduct and services could be subject to binding arbitration or the SAS ACH Agreement's arbitration provision." *Id.* at 22. Plaintiffs make a similar argument as to the Debt Agreement. *See id.* As to substantive unconscionability, Plaintiffs state that applying the arbitration provision to Plaintiffs' claims against Defendant "would be oppressive" and would fall outside Plaintiffs' initial contracting expectations. *Id.* at 23. Moreover, Plaintiffs argue that the arbitration language contains "overly broad-sweeping application to Plaintiffs' claims against Defendant" and provided no opportunity for Plaintiffs to opt-out. *Id.*

As to procedural unconscionability, Defendant counters that Plaintiffs cannot claim surprise over the arbitration clause within the ACH Agreement because it was not hidden in fine print. Doc. No. 23 at 7. Defendant argues that the Debt Agreement is not procedurally unconscionable even though it was drafted by Defendant because the Debt Agreement clearly incorporates the ACH Agreement. *Id.* Defendant adds that Plaintiffs were free to pursue other market alternatives, undercutting their oppression assertions. *Id.* at 8. Defendant argues that unsatisfied expectations do not satisfy substantive unconscionability. *See id.* at 9. Defendant states that the arbitration clause is not cost

prohibitive, applies equally to Plaintiffs and Defendant, does not restrict discovery procedures, and does not yield an imbalance of available remedies to either party. *Id.*

Agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Arbitration agreements are subject to standard general defenses. *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003). "Because unconscionability is a generally applicable defense to contracts, California courts may refuse to enforce an unconscionable arbitration agreement." *Id.*

A contract defense of "unconscionability . . . may operate to invalidate arbitration agreements." *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 892 (9th Cir. 2002). The party asserting that an arbitration agreement is unconscionable bears the burden of proof. *Sanchez v. Valencia Holding Co., LLC*, 353 P.3d 741, 749 (Cal. 2015). Both procedural *and* substantive unconscionability must be present for a court to refuse to enforce a contract. *See Armendariz v. Found Health Psychcare Servs.*, 6 P.3d 669, 690 (Cal. 2000). California courts apply a sliding scale: "the more substantively oppressive the contract terms, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id.* However, courts cannot apply principles of unconscionability in a way that undermines the FAA's objective "to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *Concepcion*, 563 U.S. at 344. Instead, courts should give "due regard to the federal policy in favor of arbitration." *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1049 (9th Cir. 1996).

### i. Procedural Unconscionability

The procedural unconscionability analysis focuses on the circumstances surrounding the creation of a contract and the presence of "oppression or surprise." *Gatton v. T-Mobile USA, Inc.*, 61 Cal. Rptr. 3d 344, 352 (Ct. App. 2007) (citing *Armendariz*, 6 P.3d at 690.). In doing so, a court must uncover "the manner in which the contract was negotiated and the circumstances of the parties at that time." *Ingle*, 328

F.3d at 1171 (quoting as *Kinney v. United HealthCare Servs., Inc.*, 83 Cal. Rptr. 2d 348, 352–53 (Ct. App.1999)). Oppression results from "an inequality in bargaining power that results in no real negotiation and an absence of meaningful choice." *Id.* (citing *Flores v. Transamerica HomeFirst, Inc.*, 113 Cal. Rptr. 2d 376, 381 (Ct. App. 2001)). Surprise arises when the "agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms." *Id.* (citing *Stirlen v. Supercuts, Inc.*, 60 Cal. Rptr. 2d 138, 145 (Cal. Ct. App. 1997). Procedural unconscionability typically takes the form of an adhesion contract, which is "a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Gutierrez v. Autowest, Inc.*, 7 Cal. Rptr. 3d 267, 275 (Ct. App. 2003). However, an adhesive contract term not being read or understood "does not justify a refusal to enforce it"; rather, the imposed term can only be denied if it is also substantively unreasonable. *Id.*; *see also Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1261 (9th Cir. 2017) ("[T]he California Supreme Court has not adopted a rule that an adhesion contract is per se unconscionable.").

Here, Defendant's name is stylized across the top of the Debt Agreement. *See* Doc. No. 17-1 at 6–9. Defendant's name is ingrained within the text whereas Plaintiffs' names are in a different inserted font. *Id.* at 6, 9. In a declaration signed by a principal member of Defendant, the member declares that "[Defendant] regularly requires that individuals offering to retain its services execute both the [Debt Agreement] and the ACH Agreement." *Id.* at 3. Therefore, the Court finds that the Debt Agreement appears to be an adhesion contract imposed and drafted by Defendant. Similar factual underpinnings persuade the Court to similarly find the ACH contract as an adhesion contract. *See* Doc. No. 17-1 at 11–12. Plaintiffs lacked the power to negotiate both contracts and only had the option to take the contracts or leave them. However, finding an adhesion contract only begins the Court's analysis. *See Parada v. Superior Court*, 98

Cal. Rptr. 3d 743, 757 (Ct. App. 2009) ("A procedural unconscionability analysis also includes consideration of the factors of surprise and oppression.").

A claim of oppression may be defeated "if the complaining party has a meaningful choice of reasonably available alternative sources of supply from which to obtain the desired goods and services free of the terms claimed to be unconscionable." *Parada*, 98 Cal. Rptr. 3d at 758. The Debt Agreement enrolled part of Plaintiffs' debts into Defendant's debt assumption program "to receive Defendant's assistance with debt settlement and to improve Plaintiffs' consumer credit, history, or rating with credit reporting agencies." Compl. ¶ 23; Doc. No. 17 at 9. The *Parada* court determined that the petitioner had "reasonable and realistic market alternatives to opening [investment] accounts, including the option of not investing in precious metals at all." *Parada*, 98 Cal. Rptr. 3d at 758. The court further reasoned that precious metal investments were not a necessity, such as admittance to a hospital or employment contexts where an adhesion contract may still be oppressive despite alternatives. *Id.* Here, the Court finds that Plaintiffs had other reasonable and realistic market alternatives to address their debt needs and entering into the Debt Agreement was not a necessity akin to hospital or employment contexts. However, Plaintiffs did not have other alternatives in executing the ACH Agreement with SAS given Defendant's own declaration: "[Defendant] regularly requires that individuals offering to retain its services execute both the [Debt Agreement] and the ACH Agreement. The case of Plaintiffs is no exception. [Defendant] required that Plaintiffs execute both the [Debt Agreement] and the ACH Agreement." Doc. No. 17-1 at 3. Despite having reasonably available alternatives as to finding a debt relief company, Plaintiffs were essentially given no alternative in selecting the third-party processor. Because of the lack of choice in selecting SAS as the third-party processor, the Court finds the arbitration clause within the SAS Agreement oppressive despite finding the terms of the Debt Agreement not oppressive.

As to surprise, the arbitration clause was not hidden. The arbitration provision is on the first page of the two-page ACH Agreement and is in the same style and typeface

as the other contract terms.  Moreover, the arbitration term rests within a clause that contains an all-capitalized, bolded, and underlined header: "**6. <u>BINDING ARBITRATION, GOVERNING LAW, AND ATTORNEY'S FEES</u>**."  *Id.* at 11.  Given that the terms of the arbitration clause were not hidden or otherwise buried within the SAS Agreement, the Court finds that there is no surprise.

Accordingly, the Court finds a moderate level of procedural unconscionability as to the arbitration clause.  The Court proceeds by assessing substantive unconscionability while keeping in mind the sliding scale relationship between procedural and substantive unconscionability.  *See Armendariz*, 6 P.3d at 690.

### ii. Substantive Unconscionability

The substantive unconscionability analysis focuses on the "terms of the agreement and whether those terms are so one-sided as to shock the conscience."  *Ingle*, 328 F.3d at 1172 (quoting *Kinney*, 83 Cal. Rptr. 2d at 353).  Courts evaluate substantive unconscionability "as of the time the contract was made."  *A & M Produce Co. v. FMC Corp.*, 186 Cal. Rptr. 114, 122 (Ct. App. 1982).  The "shock the conscience" standard requires more than a contract term that "merely gives one side a greater benefit . . . ."  *Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US), LLC*, 282 P.3d 1217, 1232 (Cal. 2012).  "Substantive unconscionability *may* be shown if the disputed contract provision falls outside the nondrafting party's reasonable expectations."  *Parada*, 98 Cal. Rptr. 3d at 759 (emphasis added) (citing *Gutierrez*, 7 Cal. Rptr. 3d at 275).

As to the specific terms of the arbitration clause, the Court finds that the arbitration clause is not one-sided.  The clause applies equally to "any dispute or claim" brought by any party that "aris[es] out of this Agreement or otherwise, related to SAS's services to Client."  Doc. No. 17-1 at 11.  Plaintiffs may view the clause as a bad bargain because it fell outside their expectations, Doc. No. 22 at 23, but a bad bargain is insufficient to trigger substantive unconscionability.  *Baltazar v. Forever 21, Inc.*, 367 P.3d 6, 11 (Cal. 2016) (internal quotation marks and citations omitted).  Substantive unconscionability requires "terms that are unreasonably favorable to the more powerful party."  *Id.* (internal

quotation marks and citations omitted).  The terms here do not reach the high threshold of shocking the conscience.

Accordingly, the court finds that the arbitration clause is not substantively unconscionable.  Given the lack of substantive unconscionability, the Court finds that the clause is not unconscionable because *both* procedural and substantive unconscionability are necessary before a court can refuse to enforce a clause under the doctrine of unconscionability.  *Id.* at 11.

### 5. Conclusion

Accordingly, the Court finds that there is a valid arbitration clause that Defendant may enforce as a third-party beneficiary of the ACH Agreement—as to disputes that arise from payment processing services.

## D. Whether the Arbitration Agreement Encompasses the Dispute at Issue

Defendant argues that the arbitration agreement covers the dispute at issue.  Doc. No. 17 at 16–17.  Defendant asserts that the expansive scope of the arbitration clause encompasses Plaintiffs' claims and that any ambiguity as to the scope should be resolved in favor of arbitration.  *Id.* at 17.  Plaintiffs respond that its claims "are outside the scope of the arbitration provision."  Doc. No. 22 at 15.  Specifically, Plaintiffs argue that its causes of action pertain to their relationship with Defendant and do not rely upon the terms of the ACH Agreement.  *See id.* at 16.

The arbitration clause states "[Plaintiffs] agree[] that any dispute or claim arising out of this Agreement or otherwise, related to SAS's services to [Plaintiff], shall be resolved through binding arbitration."  Doc. No. 17-1 at 11.  Although the Court finds that there is a valid arbitration clause that Defendant may enforce as a third-party beneficiary of the ACH Agreement, *see supra* Sections III.C.3, III.C.5, Defendant may do so only to the extent that there is a "claim arising out of this Agreement or otherwise, related to SAS's services to [Plaintiff]."  Doc. No. 17-1 at 11.  Given the Court has found that the arbitration clause is narrow in applying to payment processing services, *see supra*

Sections III.C.2–3, III.C.5, the Court accordingly finds that that the arbitration clause only encompasses disputes involving payment processing.

With the scope of the arbitration clause in mind, the Court must compare the clause's scope to Plaintiffs' allegations. Plaintiffs argue their claims address "Defendant's services to Plaintiffs, business practices, failure to perform services as promised in Defendant's agreement with Plaintiffs, breach of Defendant's duties owed to Plaintiffs, misrepresentations to Plaintiffs and the damages that Plaintiffs have incurred as a result of Defendant's violations of law." Doc. No 22 at 16. Indeed, Plaintiffs' allegations do not involve mere payment processing. *See, e.g.*, Compl. ¶¶ 82 (CROA claim), 88–89 (CCSA claim), 92–93 (same), 100 (CLRA claim), 109 (UCL claim), 119–20 (same), 133–38, (breach of contract claim), 142–43 (negligence claim), 148 (negligent misrepresentation claim), 164 (intentional misrepresentation claim). Plaintiffs' claims address their relationship with Defendant outside of payment processing. Given Plaintiffs' allegations and the clear language of the arbitration clause within the context of the ACH Agreement, the Court finds that there is no sufficient ambiguity in the contract that could otherwise result in finding in favor of arbitration. *Cf. Volt Info. Scis., Inc.*, 489 U.S. at 475–76. Plaintiffs have carried their burden in proving that their claims are unsuitable for arbitration. *See Green Tree Fin. Corp.-Alabama*, 531 U.S. at 91.

Accordingly, the Court finds that the arbitration clause does not cover the dispute at issue.

**E. Whether Attorneys' Fees Are Appropriate**

Defendant "requests leave of Court to file a motion for reasonable attorneys' fees incurred in preparing the Petition because Plaintiffs' actions constitute a frivolous refusal to arbitrate." Doc. No. 17 at 22. Plaintiffs respond that attorneys' fees are not appropriate because they filed this action in good faith. Doc. No. 22 at 25.

The traditional American rule requires each party to pay its own attorneys' fees. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 257, 263–64 (1975). However, a court has the inherent, discretionary power to award one party attorneys' fees

when another party acts "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 258–59; *see also Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 382 (2013).

Given that Plaintiffs are successful in defeating Defendant's motion to compel arbitration, the Court finds that Plaintiffs have not acted in bad faith, vexatiously, wantonly, or for oppressive reasons. Accordingly, the Court **DENIES** Defendant's request for attorneys' fees.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's motion to compel arbitration and **DENIES** Defendant's request for attorneys' fees.

**IT IS SO ORDERED**.

Dated: February 5, 2020

Hon. Michael M. Anello
United States District Judge